2026 PA Super 132

| | | |
|---|---|---|
| JOHN MUSIKA AND LINDA MUSIKA, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | No. 599 EDA 2023 |
| ABINGTON - JEFFERSON HEALTH, ABINGTON HEALTH, ABINGTON HEALTH PHYSICIANS,  ABINGTON MEMORIAL HOSPITAL, JENNIFER V. FABRIZZIO, JONAS J. GOPEZ,  HANS Y. KIM, LANSDALE HOSPITAL, NEUROLOGICAL ASSOCIATES OF ABINGTON,  STEPHEN PRIPSTEIN, RADIOLOGY GROUP OF ABINGTON PC AND WILLOW GROVE OPEN MRI, INC. | : | |

Appeal from the Judgment Entered February 2, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2015-24722

BEFORE:  BOWES, J., OLSON, J., STABILE, J., DUBOW, J., KUNSELMAN, J.,
NICHOLS, J., MURRAY, J., McLAUGHLIN, J., and BECK, J.

OPINION  BY STABILE, J.:                    **FILED JUNE 22, 2026**

Appellants, John Musika ("John") and Linda Musika ("Linda"), appeal from the February 2, 2023, judgment entered against them in their medical malpractice action against Appellees.  We affirm.

This case arises from Appellees' alleged failure to diagnose and properly treat John's chordoma, a rare spinal tumor.  The pertinent facts are not substantially in dispute.  John had a history of chronic back pain.  He saw his primary care physician ("PCP") in August of 2011 for the problem, and the

PCP ordered an MRI (the "2011 MRI"). In September of 2011, Appellee Dr. Stephen Pripstein interpreted that MRI but allegedly failed to note the presence of a mass on the L-4 vertebrae of John's spine.

Because John's symptoms persisted, a second MRI was performed on September 12, 2013 (the "2013 MRI"). Appellee Dr. Jennifer V. Fabrizzio interpreted the 2013 MRI and noted a mass on John's L-4 vertebrae but did not diagnose a chordoma. She referred John to Appellee Dr. Jonas J. Gopez. On September 14, 2013, two days before John's visit with Dr. Gopez, John underwent a CT scan of his chest, abdomen, and pelvis, which was interpreted by Appellee Dr. Hans Y. Kim. Notes from John's September 16, 2013, visit with Dr. Gopez indicate that Dr. Gopez reviewed the 2013 MRI but not the CT scan.

Dr. Gopez did not diagnose a chordoma, but scheduled John for decompressive surgery and an open biopsy to be performed on September 26, 2013, at Appellee Abington Memorial Hospital. Appellants allege that Dr. Gopez had no experience diagnosing or treating chordoma prior to that date. Appellants further allege that a biopsy specimen was sent to the Abington pathology lab for preliminary diagnosis during John's surgery, and that the lab informed Dr. Gopez during the surgery that the preliminary diagnosis was chordoma. Appellants claim that Dr. Gopez's performance of the surgery after receiving the preliminary diagnosis violated the standard of care. Dr. Gopez denied that he received a preliminary diagnosis of chordoma during the

- 2 -

surgery. He claimed he told Appellants after the operation that he removed a large section of the mass and sent it to a lab for analysis.

John underwent follow up treatment with Drs. Francis Hornicek and Gregory Cote at Massachusetts General Hospital ("MGH"), beginning in October of 2013. Dr. Hornicek operated on John in February of 2014, removing the remainder of the chordoma left behind by Dr. Gopez. Dr. Hornicek's notes from the operation indicate that Dr. Gopez's performance of the surgery made Dr. Hornicek's procedure riskier and more complicated than it otherwise would have been.

Appellants filed their complaint on October 16, 2015. Appellants advised the court prior to trial that they reached a settlement agreement with Dr. Pripstein, though Dr. Pripstein participated in the trial represented by counsel and Appellants introduced evidence against him. Appellants agreed to discontinue their cases against Abington Health, Abington Health Physicians, Neurosurgical Associates of Abington, Abington-Jefferson Health, and Lansdale Hospital. Drs. Fabrizzio and Kim, Radiology Group of Abington, P.C., and Willow Grove Open MRI, Inc. were dismissed with prejudice prior to trial. Appellants proceeded to trial against Dr. Gopez and Abington Memorial Hospital, with Dr. Pripstein participating as a defendant.

Against Dr. Pripstein, Appellants sought to prove damages resulting from his alleged violation of the standard of care in interpreting the 2011 MRI, thus allowing the chordoma to remain until John's surgery in 2013. Against

Dr. Gopez, Appellants sought to prove that he should not have performed a biopsy and back surgery at the same time. Rather, Appellants claim he should have done a needle biopsy prior to surgery, a procedure that would have produced an accurate diagnosis with less risk of releasing cancer cells into the area surrounding the tumor. Appellants claim that because Dr. Gopez cut into the tumor rather than removing it whole, John was required to undergo a second procedure at MGH to remove the remainder of the tumor, and John is at greater risk of a recurrence of the chordoma.

After the completion of discovery, Appellants served Appellees with two expert reports. In a report dated December 3, 2018, Dr. Earl W. Brien, an orthopedic surgeon with a specialty in the treatment of musculoskeletal tumors, opined that Dr. Gopez deviated from the standard of care by performing the surgery and biopsy at the same time. Dr. Brien opined that Dr. Gopez's errors, including his failure to diagnose a chordoma from the 2013 MRI, his failure to confirm that diagnosis by needle biopsy, and his subsequent failure to remove the chordoma whole, without cutting into it, put John at greater risk for a recurrence.

In a report dated November 18, 2018, Dr. Nancy M. Major, a musculoskeletal radiologist, opined that Dr. Pripstein deviated from the standard of care by failing to diagnose the chordoma during his September 2011 interpretation of John's first MRI. Appellants took recorded depositions of Drs. Cote and Hornicek on October 6, 2022 and October 18, 2022,

respectively, with the intent of introducing their deposition testimony at trial. The trial court eventually permitted Appellants to introduce portions of Dr. Cote's testimony in rebuttal. No part of Dr. Hornicek's testimony was admitted into evidence.

On November 7, 2022, nearly four years after the first reports and one week before trial, Appellants filed supplemental reports from Drs. Brien and Major. Dr. Major, in her second report, addressed the actions of Dr. Gopez as well as Dr. Pripstein.

Trial commenced on November 14, 2022. On November 18, 2022 the jury found that Dr. Gopez was not negligent; that Dr. Pripstein was negligent; and that Dr. Pripstein's negligence was the cause in fact of harm to John. The jury awarded Appellants a total of $1 million for past and future non-economic damages and loss of consortium.

Appellants filed a motion for post-trial relief, alleging that the trial court erred in precluding Dr. Major from testifying as to the information contained in her November 7, 2022, supplemental report and by precluding Dr. Brien from testifying as to some of the information contained in his November 7, 2022, supplemental report. Appellants also claimed the trial court erred in precluding the testimony of Drs. Cote and Hornicek. Finally, Appellants claimed the trial court erred in refusing to give an increased risk of harm instruction as to Dr. Gopez. The trial court denied Appellants' post-trial

motions by order of October 3, 2023. The verdict was reduced to judgment on February 2, 2023. Appellants' timely appeal followed.

Appellants present five questions (*see* Appellants' Brief at 6-7). All of them pertain to the defense verdict in favor of Dr. Gopez, and we paraphrase them as follows.

- First, Appellants argue that the trial court erred in precluding the testimony of Drs. Major and Brien on their late-filed supplemental opinions.

- Second, Appellants argue the trial court erred in not permitting Dr. Brien to rely on the testimony and operative notes of Drs. Hornicek and Cote.

- Third, Appellants argue that the trial court erred in not giving an increased risk of harm jury instruction as to Dr. Gopez.

- Fourth, Appellants argue the trial court erred in precluding the recorded testimony of Drs. Hornicek and Cote in their case-in-chief.

- Finally, and related to the previous argument, Appellants argue that the trial court erred in admitting portions of Dr. Cote's recorded testimony only in rebuttal.

*See* Appellants' Brief at 5-6. We address these issues in turn.

The applicable standard of review is as follows:

> Our standard of review when faced with an appeal from the trial court's denial of a motion for a new trial is whether the trial

court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion. In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted. Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining parties. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.

*Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 707 (Pa. Super. 2000), *appeal denied*, 785 A.2d 90 (Pa. 2001) (citation omitted). Further, we observe that "[t]he harmless error doctrine underlies every decision to grant or deny a new trial." *Grove v. Port Auth. of Allegheny Cnty.*, 218 A.3d 877, 888 (Pa. 2019). "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.*

Appellants first argue that the trial court erred in limiting their use of the "rebuttal" reports of Drs. Major and Brien, which were submitted on the eve of trial, and four years after their original expert reports. Decisions on the admissibility of expert testimony rest within the sound discretion of the trial court, and we will reverse only if the trial court abuses its discretion. *Snizavich v. Rohm and Haas Co.*, 83 A.3d 191, 194 (Pa. Super. 2013), *appeal denied*, 96 A.3d 1029 (Pa. 2014). As noted just above, Appellants can obtain relief only if a trial court error was prejudicial.

The trial court excluded the supplemental reports, and refused to permit testimony on them, because the supplemental reports offered additional opinions which were beyond the scope of the experts' original reports, and because the supplemental opinions were filed only days before trial. The rules governing discovery of expert testimony are designed to prevent this scenario:

> The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits. When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject on which to effectively rebut unexpected testimony. By allowing for early identity of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of expertise on the spot. Thus, the rule serves as more than a procedural technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify.

*Kaminski v. Empr's Mut. Cas. Co.*, 487 A.2d 1340, 1344-45 (Pa. Super. 1985); *see also* Pa.R.Civ.P. 4003.5.

Indeed, the rules are designed to ensure that each party learns the content of the opposing party's expert's testimony during discovery. "[T]he direct testimony of the expert at the trial may not be inconsistent or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto." Pa.R.Civ.P. 4003.5(c).

Dr. Major, in her November 18, 2018, report, opined that Dr. Pripstein violated the standard of care in his interpretation of the 2011 MRI by failing to note the mass on John's L-4 vertebrae. She did not address the actions of

Dr. Gopez or Dr. Fabrizzio, the original interpreter of the 2013 MRI. In her November 7, 2022, supplemental report, Dr. Major opined for the first time that Drs. Gopez and Fabrizzio violated the standard of care in their interpretation of the 2013 MRI. Because Dr. Major was to be the expert on the negligence of Dr. Pripstein, her late-filed supplemental report opining on the professional negligence of Drs. Gopez and Fabrizzio was indeed beyond the scope of her original report.

Appellants argue, however, that Dr. Major's original report criticized Dr. Pripstein for failing to observe the mass in the 2011 MRI and order a follow-up biopsy, and that the same criticism applies to Drs. Fabrizzio and Gopez with regard to the 2013 MRI. Appellants' Brief at 43-44. Even if we were to accept this argument, Appellants cannot establish prejudicial error. By the time of Dr. Major's supplemental report, Dr. Fabrizzio had been dismissed with prejudice from the case. Additionally, Dr. Brien testified at length that Dr. Gopez should have done a needle biopsy of the mass before performing the operation on it.

Next, Appellants claim that Dr. Major's supplemental report should have been admissible as rebuttal to Appellees' expert report of Dr. Gordon Sze. Appellants' Brief at 44-45. Appellants explain that Dr. Sze's report, filed on July 25, 2019, stated that the mass which was evident on John's spine in the 2011 MRI should not have been considered a chordoma. *Id.* at 52. Likewise,

- 9 -

Dr. Sze opined that chordoma should not have been included in the differential diagnosis of the 2013 MRI or the 2013 CT scan. ***Id.***

We discern no abuse of discretion in the trial court's exclusion of Dr. Major's late-filed supplemental report. Dr. Major's opinion on the performance of Dr. Gopez, as well as her rebuttal of Dr. Sze, were beyond the scope of her original report and cumulative of the opinion and eventual trial testimony of Dr. Brien. Dr. Brien opined in his original report and testified extensively at trial that a chordoma should have been considered a possibility and that a biopsy should have been done prior to the operation. Appellants fail to explain what they lost by not having Dr. Major say the same thing.

Dr. Brien's supplemental report described in detail the procedure for performing a CT-guided needle biopsy. In his original report, Dr. Brien opined that Dr. Gopez should have ordered a needle biopsy before performing surgery, because a needle biopsy was less likely to contaminate the area and thereby reduce the risk of a future recurrence. We conclude that the procedure for performing the biopsy is within the scope of Dr. Brien's original opinion, and the trial court erred in finding otherwise.

We therefore examine the record to determine whether the error was prejudicial:

> Q. Now, in terms of CT guided needle biopsy, why don't you just explain for us what that actually entails. What does that consist of?

A.      So it starts after you review the imaging studies.  You have to generate an order that states you want a CT guided biopsy.

At that point the CT guided biopsy is set up through the radiology department.  The way we do it, and I think is the standard, is that you have the radiologist define the pathway of the biopsy.  And in my cases I always check the pathway so I know if I have to remove it, I may want to have to [sic] remove the biopsy track.  So we discuss had [sic] specifically the biopsy track that be [sic] we attack it, the tumor, to make the diagnosis and to limit the contamination.

[Defense Counsel]:  Your Honor, I'm going to move to strike.  It's not contained within the scope of his report.

THE COURT:  Mr. Tumolo [Plaintiff's Counsel].

MR. TUMOLO:  Your Honor, it is.  The doctor's report includes opinion that a CT needle biopsy should have been indicated, it would have been standard of care.

* * * *

THE COURT: As to that objection, that objection is sustained.  That testimony is stricken.  You may proceed.

N.T. Trial, 11/15/22, at 34-35.

Appellants claim the error was prejudicial because Dr. Christopher Loftus, in his report on behalf of Appellees, opined that a needle biopsy posed a risk of neurological damage in the event of post-biopsy tumor bleeding. Report of Dr. Loftus, 7/24/2019, at 9 (pagination ours).[1]  Dr. Loftus opined in his report that "it is unreasonable to suggest that a needle biopsy would have

_____

[1]  Dr. Loftus' report appears in the record as Exhibit D to Appellants' brief in support of their November 28, 2022, motion for post-trial relief.

- 11 -

been a completely safe and simple expedient to resolve [John's] need for tissue diagnosis." *Id.*

Appellant's argument lacks merit. They point to nothing in Dr. Brien's original or supplemental reports that would have refuted Dr. Loftus. That is, Dr. Brien addressed, both at trial and in his reports, what he believed were the unacceptable risks of the open biopsy Dr. Gopez performed. He did not testify, or write in either of his reports, that a needle biopsy entailed **n o** risk to John, or that it was a simple procedure. He testified, rather, that a needle biopsy was the standard of care given the results of the 2013 MRI. His supplemental report stated that "[n]eedle biopsy **minimizes** local contamination and **reduces** the risk of local recurrence and possible spread of disease as compared to performing an intralesional partial excision." Supplemental Report of Dr. Brien, 11/7/22, at ¶ 2 (emphasis added).[2]

Further, we are not persuaded that the trial court's error deprived the jury of evidentiary grounds for finding that the open biopsy violated the standard of care. Appellants' argument ignores both the details of the stricken testimony and the details of other portions of Dr. Brien's testimony admitted into evidence. In the stricken testimony, Dr. Brien explained how the pathway of the biopsy is determined. Dr. Brien explained that he and a radiologist

_____

[2] Dr. Brien's supplemental report appears in the record as Exhibit I to Appellants' brief in support of their November 28, 2022, motion for post-trial relief.

discuss work together to determine the best way of making a diagnosis while limiting contamination. In his admissible testimony, Dr. Brien explained that Dr. Gopez, by cutting into the tumor and removing a portion of it rather than removing it whole, spilled "thousands, if not millions of tumor cells" into the surrounding area. N.T. Trial, 11/15/22, at 59. Dr. Brien testified that, had Dr. Gopez confirmed in advance that the tumor was a chordoma, the standard of care would have been to "remove the tumor *en bloc*, not violating the tumor itself." *Id.* at 37. Dr. Brien testified that Dr. Gopez' failure in this regard increased the risk of local recurrence. *Id.* at 59.

Later, Dr. Brien testified that the open biopsy was "done in a location that we would have tried to avoid, or should have been avoided[.]" *Id.* at 61. The partial excision of the tumor, performed after the open biopsy, is "not how we treat chordomas." *Id.* Appellants' counsel explored this point further, without objection:

> Q. Doctor, you said the first biopsy was obtained in a location that should be avoided. You're talking about where it [Dr. Gopez's operative report] says puncture the capsule? That's the location that should have been avoided?
>
> A. Yes.
>
> Q. What location for a chordoma do you biopsy?
>
> A. Well, every chordoma is different.
>
> Q. For this chordoma, based on the 2013 mass that's present on the MRI?
>
> A. **You would do a biopsy through the pedicle, and get tissue from the bone to make the diagnosis.**

*Id.* at 62 (emphasis added). Thus, Dr. Brien did eventually describe an alternate location for the performance of a biopsy. And it is clear throughout Dr. Brien's testimony that he believed Dr. Gopez's procedure posed a much greater risk of contamination of the surrounding area, and therefore a greater risk of recurrence of the tumor, than did the needle biopsy. The trial court's exclusion of Dr. Brien's supplemental report was not prejudicial to Appellants.[3] In summary, the trial court did not abuse its discretion in excluding testimony on the supplemental expert reports because (1) they were filed on the eve of trial; (2) Dr. Major's supplemental report contained opinions beyond the scope of her original report; and (3) Appellants were not prejudiced by the exclusion of either report. Appellants' first argument fails.

With their second argument, Appellants' claim the trial court erred in refusing to allow Dr. Brien to address the testimony and operative notes of Drs. Hornicek and Cote, the doctors who treated John at MGH. Appellants argue that an expert medical witness would normally rely on the notes of a plaintiff's treating physician(s). Rule 703 of the Pennsylvania Rules of Evidence governs this issue:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those

---

[3] Appellants also argue that the trial court should have admitted the supplemental reports of Drs. Major and Brien because doing so would not have prejudiced Appellees. Appellants' Brief at 44-45. This burden-flipping argument ignores Appellants' obligation to establish prejudicial trial court error before this Court. As explained in the main text, they have not done so.

kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

Appellants also cite **Commonwealth v. Thomas**, 282 A.2d 693 (Pa. 1971), in which our Supreme Court wrote:

> In Pennsylvania, our cases have heretofore ruled that an expert may not state a conclusion which is based on evidence not in the record. However, several jurisdictions influenced by the teaching of highly regarded legal commentators have recognized an exception to this rule and have permitted medical witnesses to express opinion testimony on medical matters based, in part, upon reports of others which are not in evidence, but which the expert customarily relies upon in the practice of his profession.
>
> As Professor Wigmore explains, 'where the information is that of an attending nurse or physician having personal observations and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this.' 3 Wigmore, Evidence s 688(4) (Chadbourn Revision).
>
> It appears to us that the foregoing limited exception is wise and salutary, hence we adopt it as the law in Pennsylvania.

*Id.* at 698-99 (some citations omitted). This holding was later codified in Rule 703.

Dr. Brien would have relied on the notes of Drs. Hornicek and Cote to establish that, because of Dr. Gopez's negligence, John's follow up treatment at MGH was riskier and more complex than it otherwise would have been, and that John was at a greater risk of recurrence of chordoma. Appellants' Brief at 61.

For two reasons, Appellants cannot establish that any prejudicial error in the trial court's ruling on this point. First, there is no indication in the record

that John's subsequent surgery with Dr. Hornicek was unsuccessful, or that any risks in that surgery occasioned by Dr. Gopez's alleged negligence resulted in harm to John. Second, as explained above, Dr. Brien testified at length that Dr. Gopez's negligence increased the risk of a recurrence of the tumor. Appellants' second argument does not merit relief.

Appellant's third argument is that the trial court erred in refusing to give an "increased risk of harm" jury instruction with regard to the increased likelihood of a recurrence of John's chordoma they allege resulted from Dr. Gopez's negligence. Appellants contend they established a *prima facia* case for the instruction based upon trial evidence and the testimony of their expert, Dr. Brien. Dr. Brien opined that because John had significant contamination resulting from Dr. Gopez's initial surgery and then a positive margin from his second surgery, that Dr. Gopez's negligence put John at a relatively significant risk for local recurrence at a later date. Appellants' Brief at 70. They further point out that counsel for the defendants, when moving for a nonsuit, conceded as much by admitting that Dr. Brien testified there was an increased risk of a chordoma recurrence due to Dr. Gopez's procedure. *Id.* at 67.

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

*James v. Albert Einstein Med. Ctr.*, 170 A.3d 1156, 1163–64 (Pa. Super. 2017) (citation omitted). Where evidence supports a party-requested instruction on a theory or defense, a charge on the theory or defense is warranted. *Amato v. Bell & Gossett,* 116 A. 3d 607 (Pa. Super. 2015), citing *Tincher v. Omega Flex, Inc.*, 104 A. 3d 328, 408 (Pa. 2014).

The trial court explained that it did not give an increased risk of harm instruction because John had not yet suffered a recurrence of a chordoma:

> [T]he court gave an increased risk of harm charge to the jury as to Dr. Pripstein since a *prima facie* case of causation based on Dr. Pripstein's failure to detect the chordoma allowed it to continue to grow undetected, to approximately an inch and a third, over two years. That was the actual harm suffered by [Appellant].
>
> However, the court did not give the same instruction as to Dr. Gopez. The court concluded that while [Appellant] proved that Dr. Gopez's treatment increased the risk of recurrence of cancer, fortunately [Appellant] has been cancer free, and **the absence of cancer in [Appellant] demonstrated that [Appellant] has not suffered any harm.** [***]
>
> Although this court did not provide the increased risk of harm instruction as to Dr. Gopez, it did allow [Appellants] to testify about the possibility of the recurrence of cancer as an element of damages.

Trial Court Opinion, 3/29/23, at 17-18 (emphasis added). In other words, the trial court believed that an increased risk of harm instruction was not warranted where John has yet to suffer a recurrence. Somewhat inconsistently, the court also believed Appellants were entitled to testify about the possibility of a recurrence as an element of damages. As we explain below, the trial court was correct insofar as it concluded that the increased risk of a

- 17 -

chordoma recurrence would have been properly considered by the jury as an element of damages, but the refusal to give a jury instruction on that point was error, albeit harmless error.

In the seminal case of **Hamil v. Bashline**, 392 A.2d 1280 (Pa. 1978), our Supreme Court considered the application of the Restatement (Second) of Torts § 323(a) [4] in the context of a medical malpractice case.  It was alleged that the defendant hospital failed to employ recognized and available methods of treating the decedent's myocardial infraction, thereby lessening his chances of survival.  Plaintiff's expert opined that a substantial chance of recovery, which he estimated at 75%, was terminated by defendant's failure to provide prompt treatment.  The Court held:

> [O]nce a plaintiff has demonstrated that defendant's acts or omissions, … have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.

_____

[4]  Section 323(a) provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm[.]

Restatement (Second) of Torts § 323(a).

*Id.* at 1288. Under this relaxed standard, if a plaintiff has introduced sufficient evidence that a defendant's conduct increased the risk of injury, the defendant will not avoid liability merely because the plaintiff's medical expert was unable to testify with certainty that the defendant's conduct caused the actual harm. *K.H. ex rel. H.S. v. Kumar*, 122 A.3d 1080, 1104-05 (Pa. Super. 2015), *appeal denied,* 135 A.3d 586 (Pa. 2016). As more fully explained in *Hamil*,

> Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable. Nevertheless, in order that an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct, Section 323(a) tacitly acknowledges this difficulty and permits the issue to go to the jury upon a less than normal threshold of proof.

*Hamil*, 392 A.2d at 1287-88 (footnote deleted). In other words, the effect of *Hamil* and the Court's adoption of § 323(a), are "to relax the degree of certainty ordinarily required of a plaintiff's evidence to provide a basis upon which a jury may find **causation**[.]" *Jones v. Montefiore Hosp.*, 431 A.2d 920, 924 (Pa. 1981). (emphasis added).

As to the application of section 323(a) to the facts of this case, we turn to our Supreme Court's opinions in *Zieber v. Bogert*, 773 A.2d 758, 759 (Pa. 2001) and *Gradel v. Inouye*, 421 A.2d 674 (Pa. 1980), cases cited by Appellants in their briefs. In *Zieber*, the Court framed the question before it as follows: "This appeal presents the issue of whether a plaintiff in a medical malpractice action may introduce, as an element of damages, evidence regarding his increased risk of recurrence of cancer." In *Zieber*, an initial

misdiagnosis allowed the plaintiff's cancer to persist and worsen. After a proper diagnosis, the plaintiff received the necessary treatment and achieved remission of the cancer. Remission notwithstanding, the plaintiff presented evidence that the defendants' negligence created an increased risk of recurrence. *Id.* at 760. The *Zieber* Court held that "a doctor properly may be allowed to explain the possible future effects of an injury, and with less definiteness than is required of opinion testimony on causation." *Id.* at 761. "Consequently, it was not improper for the jury to consider the possibility of future metastasis in awarding damages." *Id.* (quoting *Gradel*, 421 A.2d at 680).

In *Gradel*, the defendant surgeon misdiagnosed a post-surgery lump on the plaintiff's elbow as a callous formation. The lump was cancerous, and it eventually required an amputation of the plaintiff's arm above the elbow. *Gradel*, 421 A.2d at 676. The plaintiff's evidence indicated that he would need to be checked for metastasis of the cancer for many years. The *Gradel* Court held that the jury was permitted to consider the possibility of metastasis in fashioning a damages award. *Id.* at 680.

Importantly, for present purposes, the *Zieber* Court distinguished *Simmons v. Pacor*, *Inc.*, 674 A.2d 232 (Pa. 1996), a case in which the plaintiffs in an asbestos exposure case sought damages for the increased risk of cancer, though they had yet to contract it. The *Simmons* Court held that there was no physical injury to support the award of damages. Under those

circumstances, the plaintiffs were not precluded from filing another action if and when they developed a malignancy (at the time of the action the plaintiffs suffered only from pleural thickening). By contrast, the *Zieber* Court held that the rationale of *Simmons* did not apply where the plaintiff already had contracted cancer and suffered from the defendant's negligence:

> Here, [the plaintiff's] cancer has developed and he has already suffered its debilitating effects. The requirement of a physical injury has therefore clearly been established. Moreover, [plaintiffs] may not commence a second action, if and when the cancer recurs, based upon the same alleged negligence of [the defendant] in failing to properly diagnose the condition.

*Zieber*, 773 A.2d at 762 (emphasis added).[5]

The trial court was mistaken that John suffered no harm since he was currently cancer free. John, like the plaintiffs in *Zieber* and *Gradel*, had contracted cancer (a metastatic chordoma) but as of the time of trial had not yet suffered a recurrence. He, however, produced evidence that Dr. Gopez was negligent and that this negligence increased the likelihood of a recurrence. Once Appellants demonstrated that Dr. Gopez's acts or omissions increased the risk of harm to John, such evidence was sufficient to furnish a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm. *Hamil.* Here,

_____

[5] To the extent Appellants sought to recover for the alleged increased risk of a recurrence of John's chordoma, they had to do so in this case, since any increase in harm they claimed pertained to the same allegations of negligence asserted in this action.

Appellants introduced evidence that the increased risk of a recurrence directly related to John's cancerous chordoma. If Dr. Gopez's negligence exacerbated this injury through inappropriate treatment such that he increased the risk that John may sustain a recurrence, then John may claim he suffered a compensable injury under *Zieber* and *Gradel*. We therefore agree that Appellants were entitled to have the court provide the jury with an increased risk of harm instruction. The evidence supported such a charge. The trial court's denial of the instruction on the basis that John is currently cancer free runs contrary to the holdings in *Zieber* and *Gradel*. The failure of the trial court to provide an increased risk of harm instruction was error.

The error, however, was not prejudicial because the jury found no breach of duty on the part of Dr. Gopez, or in other words, he was not negligent. The jury therefore had no occasion to consider the issue of causation, i.e., whether Dr. Gopez's alleged negligence caused an increased risk of a chordoma recurrence, and no occasion to fashion an award of damages based on that increased risk. An increased risk of harm instruction only bears on causation and damages after negligence has been established. The absence of an increased risk of harm instruction could not have affected the outcome of the trial where the jury did not make the predicate finding to causation that Dr. Gopez was negligent. Without a finding of negligence, any error by the trial court to decline to provide an instruction on an increased risk of harm was not prejudicial error.

Seeking to avoid this conclusion, Appellants contend that **_Jones_** is controlling. The **_Jones_** Court held it was prejudicial error not to give an increased risk of harm charge. **_Jones_**, 431 A.2d at 922, 925-26. **_Jones_** is distinguishable. The **_Jones_** Court noted that a jury might have reached its defense verdict based on jury instructions that were incomplete and erroneous because they omitted the increased risk of harm instruction. **_Id._** Absent from **_Jones_**, however, is any indication that the jury found no breach of duty on the part of the defendants. The **_Jones_** Court made clear that the purpose of an increased risk of harm instruction is to relax the plaintiff's burden of proving causation. **_Id._** at 924. The verdict slip in the instant case establishes that the jury did not reach causation. There is no mention of a verdict slip in **_Jones_**, and therefore **_Jones_** does not govern the outcome here. Appellants have failed to establish that the trial court committed prejudicial error in refusing to give an increased risk of harm instruction.

Appellants' fourth argument is that the trial court erred in excluding the testimony of Drs. Hornicek and Cote, John's treating physicians at MGH. Appellants wished to examine Drs. Hornicek and Cote about their consultation and operation notes. Neither doctor produced a written opinion, and Appellants did not seek to produce them as experts.[6]

_____

[6] Rule 4003.5(a) of the Pennsylvania Rules of Civil Procedure requires disclosure of the identity and the substance of the testimony of experts to be called at trial, and Rule 4003.5(b) directs that experts not disclosed in
*(Footnote Continued Next Page)*

The trial court refused to admit Dr. Hornicek's testimony for the following reasons.

> As to Dr. Hornicek, [Appellants] specifically sought to introduce testimony that related to the standard of care that [John] should have received from Dr. Gopez. According to [Appellants], the primary purpose of having Dr. Hornicek testify was to corroborate Dr. Brien's testimony regarding standard of care treatment. However, after thorough examination of Dr. Hornicek's operative notes and treatment records this Court determined that they did not contain an opinion as to standard of care. Further, [Appellants'] counsel represented to the Court after reviewing the deposition of Dr. Hornicek that 'he doesn't state that his treatment was standard of care. At least from my review of it.' Additionally, a majority of the proffered testimony of Dr. Hornicek relates to the procedures and manner in which surgery was performed at [MGH].

Trial Court Opinion, 3/29/23, at 14 (citations omitted).

Appellants do not offer a substantive response to the trial court's ruling. They do not describe which portion or portions of Dr. Hornicek's testimony should have been admitted, nor do they describe how the absence of Dr. Hornicek's testimony prejudiced them. As such, Appellants have failed to establish a meritorious argument with regard to Dr. Hornicek's testimony.

---

accordance with subsection (a) shall not be permitted to testify. Pa.R.Civ.P. 4003.5. Rule 4003.5 is designed to prevent unfair surprise and give the opposing party an opportunity to prepare a response. *See Feden v. Conrail*, 746 A.2d 1158, 1161 (Pa. Super. 2000). But a doctor witness whose opinions arise from treatment of the litigant, and whose opinions were formed before litigation commenced, is not subject to the requirements of Rule 4003.5. *See Katz v. St. Mary Hosp.*, 816 A.2d 1125, 1127 (Pa. Super. 2003). Appellants address the operation of Rule 4003.5 in their brief, but the trial court did not rely on this Rule in excluding the testimony of Drs. Hornicek and Cote.

Appellants wished to use Dr. Cote's testimony for the same purpose as Dr. Hornicek's—to corroborate Dr. Brien's opinion on the standard of care governing Dr. Gopez's performance. The trial court disallowed Dr. Cote's testimony under § 512(c)(2) of the MCARE Act:

> (a) **General rule**.--No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.
>
> * * * *
>
> (c) **Standard of care**.--In addition to the requirements set forth in subsections (a) and (b), an expert testifying as to a physician's standard of care also must meet the following qualifications:
>
> (1) Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.
>
> (2) Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).
>
> * * * *
>
> (e) **Otherwise adequate training, experience and knowledge**.--A court may waive the same specialty and board certification requirements for an expert testifying as to a standard of care if the court determines that the expert possesses sufficient training, experience and knowledge to provide the testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-year time period.

40 P.S. § 1303.512.

In essence, § 512(c)(2) requires that a witness who will testify as to the appropriate standard of care practice in the same subspeciality as the defendant. The trial court reasoned that Dr. Cote, an oncologist, was not qualified to testify to the standard of care for the performance of Dr. Gopez, a neurosurgeon. Trial Court Opinion, 3/29/23, at 15. Appellants do not dispute that Dr. Cote is not qualified to testify as to the standard of care applicable to Dr. Gopez under Section 512(c)(2). They argue instead that the trial court should have waived that requirement pursuant to Section 512(e).

Appellants rely on *Gbur v. Golio*, 963 A.2d 443 (Pa. 2009) (Opinion Announcing the Judgment of the Court), in which the plaintiff sought to introduce the expert testimony of an oncologist to establish the standard of care applicable to a urologist who treated the decedent for prostrate cancer. Regarding the proper interpretation of § 512(e), the *Gbur* Court wrote:

> [T]he statute should be read to require a close enough relation between the overall training, experience, and practices of the expert and that of the defendant-physician to assure the witness's expertise would necessarily extend to standards of care pertaining in the defendant-physician's field. … [W]e find the mere fact that two physicians may treat the same condition to be insufficient, in and of itself, to establish such a relation among their fields of medicine.

*Id.* at 459. This analysis of § 512(e) appears in an opinion announcing the judgment of an equally divided Court, and is therefore not binding. In any event, it does not support Appellants' arguments here. Inherent in both the text of § 512(e) and the *Gbur* plurality's analysis of it is the need for evidence to support a conclusion that the proposed expert's training, experience, and

practice is sufficiently similar to the defendant's. Appellants cite no such evidence. Rather, they baldly assert that Dr. Cote has extensive experience in the research, diagnosis, and treatment of patients with chordomas. Appellants' Brief at 78-79. Appellants fail to explain how this assertion, even if supported by record evidence, is sufficient to meet the standard articulated by the *Gbur* plurality. Appellants' fourth argument fails.

With their fifth and final argument, Appellants assert that the trial court erred in admitting portions of Dr. Cote's deposition testimony only in rebuttal, rather than in Appellants' case-in-chief. In connection with this argument, Appellants assert once again that Dr. Cote met the criteria of Section 512 of the MCARE Act. Appellants' Brief at 80. We have already rejected Appellants' argument that the trial court erred in excluding Dr. Cote's testimony during their case-in-chief. Furthermore, Appellants do not explain how they were prejudiced by the trial court's subsequent decision to permit them to introduce portions of Dr. Cote's testimony during rebuttal. Appellant's fifth argument fails.

In summary, we have concluded that Appellants have failed to identify any reversible, prejudicial error on the part of the trial court. We therefore affirm the judgment.

Judgment affirmed.

Judge Bowes, Judge Olson, Judge Dubow, and Judge Murray join the opinion.

Judge McLaughlin files a concurring and dissenting opinion in which Judge Kunselman, Judge Nichols, and Judge Beck join.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/22/2026